1
2
3
4             UNITED STATES DISTRICT COURT
5                 DISTRICT OF NEVADA
6   JOHN BRYANT LAWSON,                    3:14-cv-00345-WGC
7                          Plaintiff,      **FINDINGS OF FACT AND
                                           CONCLUSIONS OF LAW**
8       v.
9   WILLIAM M. LAWSON, JR., SHARON
    ONDREYCO, M.D., individually, and in their
10  capacities as Trustees of the William M. Lawson
    Irrevocable Trust dated December 17, 1997, and
11  DOES 1 to 5, inclusive,
12                         Defendants.
13

14       On July 2, 2014, plaintiff John Bryant Lawson filed this action seeking, *inter alia*, to

15  rescind a settlement agreement he entered into with Defendants to resolve a petition he filed in

16  the Los Angeles Superior Court concerning a trust to which he was a beneficiary. (ECF No. 1.)

17  The corrected amended complaint in this action was filed on December 17, 2014. (ECF No. 25.)

18  Defendants are William M. Lawson, Jr., and Sharon Ondreyco, M.D., individually and as

19  trustees of the William M. Lawson Irrevocable Trust dated December 17, 1997. The amended

20  complaint asserts the following claims: (1) Financial Abuse of Dependent Adult; (2) Intentional

21  Infliction of Emotional Distress; (3) Breach of Fiduciary Duty; (4) Rescission of Settlement

22  Agreement; and (5) Constructive Fraud. (*Id.*) Defendants filed their answer on December 24,

23  2014. (ECF No. 26.)

24       The parties subsequently consented to the undersigned handling this matter for all

25  purposes. (ECF No. 36.) On February 19, 2015, the court ordered the action bifurcated to

26  proceed first with the threshold claim of rescission of the settlement agreement. (ECF No. 46.)

27  The court conducted a bench trial on the rescission claim on September 28 and 29, 2015. (*See*

28  ECF Nos. 103-105.) After considering and weighing all the evidence and the parties' arguments,

and having assessed the credibility of the witnesses, the court now enters its findings of fact and conclusions of law consistent with Federal Rule of Civil Procedure 52(a)(1).

## I. FINDINGS OF FACT

1. Plaintiff John Lawson is a beneficiary of the William M. Lawson Irrevocable Trust dated December 17, 1997 (IT), created by William M. Lawson (the father of plaintiff John Lawson and defendant William M. Lawson, Jr. (Trustor)).

2. The IT was created for the benefit of plaintiff John Lawson and his daughter, Tiffany Bell Lawson (Tiffany).

3. Defendants William M. Lawson, Jr., and Sharon Ondreyco, M.D., were named co-trustees of the IT.

4. The IT provided that during the lifetime of the Trustor, the trustees had discretion to distribute portions of the income and principal to maintain education and support for Tiffany and to maintain support for John.

5. The IT further provided that when Tiffany turned thirty-five, the IT would terminate and the remaining assets would be distributed to Tiffany (with other conditions if the she died before age thirty-five).

6. Plaintiff John Lawson was a beneficiary of various other trusts created by his father and step-mother: the Admiral William M. Lawson Maritime Trust (Maritime Trust); the Sharon L. Lawson Revocable Trust (Sharon's Trust); and the Captain Bill's Descendants' Trust (Descendants' Trust).

7. The Trustor passed away in January 2004.

8. In December 2004, William M. Lawson, Jr., engaged attorney Bradley S. Hahn, to assist him and Sharon Ondreyco, M.D., in understanding the criteria and procedures for disbursements from the IT following the death of the Trustor. His letter seeking advice informed Mr. Hahn that his brother John Lawson was partially disabled, did not work, and had constant health problems. He also discussed his niece, Tiffany, and advised that they both could use a supplement to their income.

///

9. On October 11, 2005, William M. Lawson, Jr., advised John Lawson that he would be filing a petition to determine the conditions and standards for distribution under the IT and would be asking for an expedited hearing due to John Lawson's dental needs.

10. On October 20, 2005, William M. Lawson, Jr., and Sharon Ondreyco, M.D., as co-trustees of the IT, filed a petition in the Maricopa County Superior Court in Arizona (where they resided), seeking instructions regarding the distribution of income and principal and standards for such distribution because the IT did not provide instruction to the co-trustees as to the invasion of income and principal after the Trustor's death but prior to Tiffany attaining age thirty-five. They simultaneously filed a motion for an expedited hearing on their petition, citing that one of the beneficiaries needed extensive dental work anticipated to cost in excess of $5,000, for which the beneficiary was without sufficient funds.

11. The co-trustees subsequently sought a continuance of the November 17, 2005 hearing so that Tiffany could obtain local counsel. The motion for a continuance also indicated that John Lawson had represented that he no longer required the funds from the IT for immediate medical expenses and was also seeking local counsel, obviating the need for an emergency hearing. The co-trustees asked for an evidentiary hearing since the petition appeared to be contested.

12. John Lawson secured Emily Burns, Esq. as his counsel in the Arizona litigation. The parties to the Arizona litigation attempted to resolve the matter by stipulation, but there was a breakdown in negotiations and no stipulation was reached. While John Lawson initially indicated he was agreeable to resolving the litigation, he subsequently changed course, and at that time his attorney sought to withdraw. Before Ms. Burns withdrew, however, she objected to Tiffany's counsel's request that the IT be terminated and the assets be distributed to Tiffany. Instead, Ms. Burns proposed that some money be left in the IT for John Lawson's future needs, subject to a cap being set on the dollar amount.

13. On August 28, 2006, the Maricopa County Superior Court held an evidentiary hearing on the petition. The co-trustees appeared represented by counsel. John Lawson appeared telephonically on his own behalf, and Tiffany appeared by counsel telephonically. The court concluded that the trust was silent as to the set of circumstances created by the Trustor's death

prior to Tiffany reaching age thirty-five which would cause the dispositive portion of the IT to come into effect. The court revoked provisions 6.1 and 6.2 of the original IT. In their place, the court stated that the trustees had discretion to distribute income and principal to Tiffany for her education and other needs. The trustees also had discretion to distribute income and/or principal to John Lawson, but only if there were "verified dire and extreme circumstances." In addition, the court directed the trustees within sixty days of the order to establish a beginning balance (the residue of the IT principal after all attorneys' fees and other expenses of the parties involved in the petition were paid, and after funds were distributed to Tiffany to purchase a laptop computer), and to notify the beneficiaries of that amount. The beginning balance was to be recalculated if additions were made to the IT, with notice being provided to the beneficiaries. The court further stated that no more than twenty percent of the beginning balance of the IT should be paid to John Lawson for any reason throughout the life of the IT. Attorney's fees in the amount of $5,000 incurred by the trustees in resolving the petition were to be counted against John Lawson's twenty percent lifetime distribution. A formal order containing these revised provisions was entered by the Maricopa County Superior Court on September 20, 2006. The Arizona court order was still in effect in June of 2013, when, as will be discussed *infra*, the parties entered into the settlement agreement that is the subject of this action.

14. On April 11, 2007, William M. Lawson, Jr., advised John Lawson and Tiffany that Tiffany had requested monthly disbursements, and he agreed to disburse $200 a month to her, but would approve a $300 monthly disbursement if they both approved.

15. On February 11, 2008, William M. Lawson, Jr.'s counsel, Mr. Hahn, advised William M. Lawson, Jr., that he had received a dental treatment plan for John Lawson, and based on his calculations, John Lawson should receive a distribution for this purpose, with a portion payable to John and a portion directly to his dentist.

16. In April 2009, William M. Lawson, Jr., and Sharon Ondreyco, M.D., agreed to resign as co-trustees of the IT; however, this was conditioned on John Lawson accepting the resignation and signing a release in their favor. John Lawson did not sign the release; therefore, the resignation was not effective.

17. On September 2, 2011, William M. Lawson, Jr., sent correspondence to John Lawson's then-counsel, Wareham C. Seaman, Jr., stating that he had advised John Lawson he would not disburse money from the IT without a court order because John Lawson had consistently threatened him with ethics complaints and lawsuits over the past several years. He also told Mr. Seaman that John Lawson had advised him that he had a brain tumor. William M. Lawson, Jr., told Mr. Seaman that he would not pay the medical bills related to the tumor unless he received clear instruction from Mr. Seaman and his own counsel as to what the IT was responsible for, and would have the bills paid that were consistent with the terms of the IT. Finally, he advised that the IT had $30,000 in its bank account, but a $120,000 disbursement to the IT was expected within weeks.

18. In October 2011, the Maritime Trust paid approximately $120,000 into the IT.

19. In May or June of 2012, John Lawson retained Mary Marsh Linde, Esq. to represent him in his efforts to obtain money from the IT for his health conditions. He paid her a $5,000 retainer.

20. On August 30, 2012, William M. Lawson, Jr., sent accounting records for the IT for the period of September 1, 2011 to June 30, 2012, to Ms. Linde on John Lawson's behalf and to Tiffany. The balance of the IT included the receipt of a disbursement from the Maritime Trust in the realm of $120,000.

21. On March 4, 2013, Plaintiff, represented by Ms. Linde, filed in the Los Angeles County Superior Court a Petition to Transfer to this Court; Remove Trustees and Appoint Successor Trustee; to Segregate Merged Funds and Restore to Separate Trusts Appoint Forensic Accountant to Segregate Merged Accounts and to Respond to Objections to Accountings; Vacate Arizona Order for Extrinsic Fraud; Direct Trustee to Distribute Segregated Funds for Petitioner's Health Needs; Award Damages to Petitioner for Respondent's Failure to Notify him of Trust and Breach of Fiduciary Duties; and for Attorney's Fees and Costs of Petition. The respondents named in the petition were William M. Lawson, Jr., and Sharon Ondreyco, M.D., who are also the defendants in this action.

///

- 5 -

22. In response to the petition, on April 1, 2013, attorney Larry R. Bemis made a special appearance on behalf of William M. Lawson, Jr., and Sharon Ondreyco, M.D., as individuals, and moved to quash service of the petition. The caption page of the motion indicates that Mr. Bemis was representing William M. Lawson, Jr., and Dr. Ondreyco as individuals, but the body of the motion states that to the extent the activities complained of in the petition are claimed to have been undertaken by William M. Lawson, Jr., and Sharon M. Ondreyco, M.D., as trustees, they maintain that the court also lacked jurisdiction over them as individuals and also in their capacity as trustees.

23. Mr. Bemis' attorney's fees were paid out of funds from the IT.

24. On April 16, 2013, in the hallway of the Los Angeles Superior Court, a conversation took place between John Lawson, Ms. Linde and Mr. Bemis. Ms. Linde told Mr. Bemis that his client, William M. Lawson, Jr., had told them that he would not make a disbursement without obtaining a release in favor of the co-trustees. Ms. Linde advised him it was illegal under California law to condition a disbursement on obtaining a release. Mr. Bemis told Ms. Linde and Mr. Lawson that he did not know whether or not William M. Lawson, Jr., had said this, but he agreed that if he did, it would be contrary to the California statute. Ms. Linde physically got in between John Lawson and Mr. Bemis and again told Mr. Bemis that conditioning a disbursement to John Lawson on signing a release was illegal. According to Ms. Linde, Mr. Bemis then backed down. As Ms. Linde subsequently described it, she "schooled" him and made him "change horses."

25. Ms. Linde claims that Mr. Bemis then told her and John Lawson that if they did not settle then William M. Lawson, Jr., would "spend the trust to zero." The court, however, finds as credible Mr. Bemis' testimony that he did not threaten to "spend the trust to zero." Instead, he advised Ms. Linde and John Lawson that if the parties engaged in protracted litigation over a petition he deemed to be filed in the wrong venue and without merit, it would reduce the value of the IT.

26. Following the April 16, 2013 hallway conversation, Ms. Linde and Mr. Bemis continued to engage in discussions. In her initial communication on April 25, 2013, Ms. Linde

1   again urged Mr. Bemis to advise his client that he could not condition a disbursement on John

2   Lawson signing a release. She reiterated that John Lawson was seeking a distribution for his

3   medical needs.

4       27. In his response, Mr. Bemis advised Ms. Linde that William M. Lawson, Jr., had never

5   conditioned a disbursement on John Lawson signing a release. Instead, the request for a release

6   was made in connection with the prior proposal that William M. Lawson, Jr., and Sharon

7   Ondreyco, M.D. resign as co-trustees, which did not occur. Regarding disbursements, Mr. Bemis

8   said the only condition William M. Lawson, Jr., placed on any requested distributions was that

9   John Lawson provide him with copies of medical bills, but those were never received.

10       28. On April 29, 2013, Ms. Linde sent Mr. Bemis a settlement proposal. Her own

11   proposal included as a term that John Lawson and Tiffany would execute a release of liability in

12   favor of William M. Lawson, Jr., and Sharon Ondreyco, M.D. The proposal further requested,

13   *inter alia*, that after August 29, 2012, William M. Lawson, Jr., would not deduct any attorneys'

14   fees or costs from the IT, with the exception of those fees related to a final accounting.

15       29.  Over  the  next  few  days,  Mr.  Bemis  and  Ms.  Linde  exchanged  various

16   communications in an effort to reach a mutually agreeable settlement of the Los Angeles

17   petition. Mr. Bemis advocated that the attorneys' fees and costs incurred by the co-trustees in

18   filing the motion to quash and in concluding a settlement of the petition were properly paid out

19   of the IT's funds. While Ms. Linde initially objected to this term, she ultimately acquiesced.

20   There was no further discussion specifically related to the inclusion of the release term, which

21   had been proposed by Ms. Linde in the first instance.

22       30. Ms. Linde communicated that in order to reduce the fees incurred in connection with

23   the settlement, she would prepare the settlement agreement and stipulation to take the petition

24   and motion to quash off calendar.

25       31. As contemplated by the settlement discussions, on June 4, 2013, William M. Lawson,

26   Jr., sent an accounting for the IT for the period of July 1, 2012 to May 24, 2013, to John Lawson

27   in care of Ms. Linde, and to Tiffany. The amounts paid from the IT during this time included

28   $28,000 to Mr. Bemis' law firm for legal fees.  On June 11, 2013, William M. Lawson, Jr., sent

Ms. Linde the accounting of the IT for the periods of January 2, 2004 to October 31, 2006, November 1, 2006 to May 31, 2009, and June 1, 2009 to August 31, 2011.

32. A settlement agreement resolving the petition was filed in the Los Angeles County Superior Court and was signed by William M. Lawson, Jr., and Sharon Ondreyco, M.D., and John Bryant Lawson on June 26, 2013, and by Tiffany on June 27, 2013.

33. The letter from Ms. Linde attaching the settlement agreement executed by John Lawson and Tiffany commenced by stating: "Enclosed please find the original signatures of John Lawson and Tiffany Munoz on the Settlement agreement intended to conclude this matter." In closing it stated: "Thank you for ensuring that this matter is timely and fully concluded."

34. Pursuant to the settlement agreement, the parties agreed that: (1) John Lawson and Tiffany would be appointed as successor co-trustees; (2) William M. Lawson, Jr., and Sharon Ondreyco, M.D., would account to John Lawson and Tiffany for the IT showing receipts and/or additions to the Descendant's Trust received by the IT from and after June 30, 2012, and the respective sources thereof, including correct and filed tax returns as to the trust income and K-1s and show all expenses incurred or to be deducted; (3) William M. Lawson, Jr., would deliver to Plaintiff and Tiffany an accounting from April 3, 2011 through no later than June 1, 2013; (4) William M. Lawson, Jr. and Sharon Ondreyco, M.D. could reserve $3,000 to cover expenses incurred in the settlement of the action or accounting; (5) William M. Lawson, Jr., and Sharon Ondreyco, M.D. would cause the sum ascertained pursuant to the accounting to Ms. Linde by June 28, 2013; (6) the funds would be allocated between John Lawson and Tiffany as they jointly directed in writing to Ms. Linde; (7) the attorney's fees incurred by William M. Lawson, Jr., and Sharon Ondreyco, M.D. in connection with the Los Angeles petition and motion to quash were paid by the IT and were agreed to be allowable expenses.

35. The settlement agreement also stated that it was "intended to be a comprehensive and final settlement of the Action and all disputes concerning the subject Trust between the parties hereto[.]"

36. The settlement agreement contained a mutual release, stating that each party: "hereby releases, relieves and forever discharges each other person named in this agreement and

their agents, employees, heirs, representatives, successors, and assigns from any and all claims, demands, controversies, actions and causes of actions, costs, expenses, attorneys' fees, damages, compensation and liabilities, whether known or unknown, suspected or claimed, and whether or not contingent, which each of them has, has had, or may have against any other party to this agreement, relating to or resulting from the management, administration or distribution of the William M. Lawson Irrevocable Trust or the entities or properties in which said Trust had an interest through the date of execution of this Agreement."

37. Plaintiff agreed to file a dismissal of his petition, and Defendants agreed to withdraw the motion to quash.

38. The agreement provided that it would be interpreted and enforced according to the laws of California.

39. A stipulation to take the petition and motion to quash off calendar pending settlement negotiations was filed on May 6, 2013. The motion to quash was withdrawn on July 11, 2013, and the Los Angeles petition was dismissed on July 16, 2013.

40. On July 2, 2014, Plaintiff filed this action seeking, *inter alia*, to rescind the settlement agreement. The amended and operative complaint was filed on December 17, 2014.

41. John Lawson graduated from high school and attended various colleges.

42. John Lawson was last employed in 2002, and his previous employment was as a plumber and property manager.

43. John Lawson's medical conditions included broken hips, blurry vision, dental problems, as well as pain in his back, shoulders and knees. He conveyed to his brother, William M. Lawson, Jr., that he suffered from a brain tumor. He sought treatment for the pain caused by these conditions, and took pain medications.

44. Plaintiff received monthly disbursements from the Maritime Trust, which varied between $3,800 and $8,000 per month.

45. From 2011 to 2013, his medical expenses were approximately $1,200 to $1,500 per month. His prescription medications during this time period cost him $200 to $300 per month.

As of June 2012, he had a credit with his dentist in the amount of $960.15, as he had pre-paid his dentist for dental care.

46. As of March 2013, John Lawson was able to pay for food as well as his rent and utilities.

47. He paid Ms. Linde a $5,000 retainer, and then paid her $2,000 out of every disbursement he received towards his legal bills.

48. John Lawson had no direct discussions with his brother regarding the settlement agreement. He was in Ms. Linde's office when he signed the settlement agreement, and his brother was not present. No time constraints or other restrictions were placed on him signing the agreement.

49. Mr. Bemis's statements in the hallway of the Los Angeles Superior Court in April 2013 had no bearing on John Lawson signing the settlement agreement. John Lawson testified that he knew he was giving up his right to bring the current lawsuit by signing the settlement agreement, and he believed he was signing a valid release.

50. Ms. Linde never sought to have a guardian appointed for John Lawson, which would have been required if he were unable to make decisions on his own. She represented him for the entirety of the Los Angeles petition.

51. Ms. Linde sought tax advice before John Lawson signed the settlement agreement.

52. Ms. Linde allowed John Lawson to sign the agreement.

53. None of Ms. Linde's communications during the settlement negotiations indicated that John Lawson was being forced or coerced to sign the settlement agreement, or indicated that he was signing the agreement under duress. Instead, the negotiations took place among seasoned attorneys.

54. Ms. Linde did not contact the Los Angeles Superior Court to complain that her client was being bullied into entering into a settlement agreement.

55. At no time did Ms. Linde ask the Los Angeles Superior Court to freeze the assets of the IT while the matter was being litigated.

///

56. By virtue of signing the agreement, John Lawson gained access to the funds (receiving a net amount of $106,000 for himself), and assumed the responsibility of allocation of the funds between Tiffany and himself. He lost the ability to pursue Defendants for any alleged wrongful conduct in connection with the IT.

57. William M. Lawson, Jr., and Sharon Ondreyco, M.D. never took a trustee's fee for administration of the IT.

## II. CONCLUSIONS OF LAW

1. Jurisdiction is predicated upon 28 U.S.C. § 1332(a)(1), and was not contested in this action.

2. In June of 2013, John Lawson entered into a settlement agreement with William M. Lawson, Jr., and Sharon Ondreyco, M.D., to resolve the Los Angeles petition filed by John Lawson concerning administration of the IT.

3. The settlement agreement is a contract containing a mutual release of all claims relating to or resulting from the management, administration or distribution of the IT.

4. As part of the relief sought in this action, John Lawson seeks rescission of the settlement agreement. If the court finds he is not entitled to this relief, it is undisputed by the parties that the mutual release contained in the settlement agreement bars John Lawson's remaining claims in this action.

### Governing Law

5. The parties agree that the rescission claim is governed by California law. The court will discuss the interplay between the California Civil Code, California common law, and California Probate Code and Welfare and Institutions Code in its assessment of the resulting legal conclusions.

### California Law of Rescission

6. In California, a contract may be "extinguished by its rescission." Cal. Civ. Code § 1688.

7. Prior to 1961, California recognized two methods by which a party could obtain the relief of rescission: (1) unilateral rescission, followed by an action to enforce the out-of-court

rescission; or (2) an action for judicial rescission on any of the grounds set forth in the prior version of Civil Code section 1689 along with two additional grounds. *See E.T. Runyan v. Pacific Air Industries, Inc.,* 466 P.2d 682, 687-88, 2 Cal.3d 304, 311-12, 85 Cal.Rptr. 138, 143-44 (1970) (citations omitted). The first of type of action was considered an action at law "brought on the implied promise on the part of the nonrescinding party to repay or return the consideration received." *Runyan,* 2 Cal.3d at 312 (citation omitted). The second action was viewed as equitable because it was "an action for specific judicial relief for the wrong giving rise to the right of rescission[.]" *Id.* (citation omitted).

8. In 1961, the California Legislature abolished the action to obtain judicial rescission and left an action to obtain relief based on a party effecting rescission. *Id.* Now, in an action to obtain relief based on rescission, the rescinding party may seek "any form of relief warranted under the circumstances, whether legal or equitable." *Id.* (internal quotation marks and citation omitted). "[T]he right of the parties to a jury and the court in which the action must be brought will be determined by the nature of the substantive relief requested and not by the form of the complaint." *Id.* If, for example, only a money judgment is sought, the action is one at law. *Id.*

9. Here, John Lawson's fourth cause of action for rescission seeks to rescind the settlement agreement and also seeks an award of attorney's fees and costs incurred in bringing this action. (ECF No. 25 at 13-16.) The parties have agreed that the court sits in equity and consistent with this, proceeded with a bench trial on the issue of rescission.

10. Under the current civil statutes, the court does not rescind contracts but affords relief based on a party's act of rescission. In order to rescind a contract, a party must promptly give notice of rescission to the other party to the contract, and restore everything of value which he received under the contract or offer to do so. Cal. Civ. Code § 1691. If notice is not otherwise made, the service of a pleading that seeks relief based on rescission is deemed to be such notice or an offer to restore or both. *Id.* Once a contract has been rescinded, any party to the disaffirmed contract may seek relief by "bringing an action to recover any money or thing owing to him by any other party to the contract as a consequence of such rescission or for any other relief to which he may be entitled under the circumstances." Cal. Civ. Code § 1692. By bringing this

action, John Lawson has given notice of rescission. For the reasons set forth in the corrected amended complaint, John Lawson asserts that he need not restore everything of value which he received under the terms of the settlement agreement. (*See* ECF No. 25 at 13-14 ¶ 46.) The court would only address this argument if it finds John Lawson is otherwise entitled to the rescission-based relief he seeks.

11. Whether to grant relief based on rescission "generally rests upon the sound discretion of the trial court exercised in accord with the facts and circumstances of the case," and that discretion "should be exercised in accord with the principles and precedents of equity jurisprudence." *Hicks v. Clayton*, 67 Cal.App.3d 251, 265, 136 Cal.Rptr. 512 (1977).

12. "A party to a contract cannot rescind at his pleasure, but only for some one or more of the causes enumerated in section 1689 of the Civil Code." *NMSBPCSLDHB v. County of Fresno*, 152 Cal.App.4th 954, 959, 61 Cal. Rptr.3d 425, 428 (2007) (internal quotation marks and citation omitted). "'Rescission' is a 'retroactive termination' of a contract[,]" the consequence of which "is not only the termination of further liability, but also the restoration of the parties to their former positions by requiring each to return whatever consideration has been received." *Id.* (internal quotation marks and citations omitted).

13. In California, absent mutual consent to rescind a contract:
(b) A party to a contract may rescind the contract in the following cases:
(1) If the consent of the party rescinding ... was ... obtained through duress ... or undue influence, exercised by or with the connivance of the party as to whom he rescinds, or of any other party to the contract jointly interested with such party.
... [or]
(5) If the contract is unlawful for causes which do not appear in its terms or conditions, and the parties are not equally at fault.
...

Cal. Civ. Code § 1689.

14. John Lawson argues that Defendants placed undue influence on him and used economic duress to coerce him into entering into the settlement agreement with him. He further asserts that the settlement agreement was unlawful or illegal because it violated California Probate Code section 16005.6. The court will now address each of those theories of rescission advocated by John Lawson.

**Illegality**

15. Plaintiff may not rescind the settlement agreement on the basis that it violates California Probate Code section 16005.6. Once again, the premise of this argument is Plaintiff's assertion that William M. Lawson, Jr., conditioned a disbursement on John Lawson signing a release relieving Defendants of liability for their conduct as trustees which John Lawson contends is illegal under California Probate Code section 16004.5.

16. California Probate Code section 16004.5 makes it unlawful for a trustee to "require a beneficiary to relieve the trustee of liability as a condition for making a distribution or payment to, or for the benefit of, the beneficiary, if the distribution or payment is *required* by the trust instrument." Cal. Prob. Code § 16004.5(a) (emphasis added).

17. In this case, distributions were not *required* under the IT, but were *discretionary* with the trustee, both in the original IT and as reformed by the Arizona court.

18. Moreover, the evidence reflects that William B. Lawson, Jr., never conditioned a disbursement on receiving a release, but instead, requested a release when it was proposed that he and Dr. Ondreyco would resign as co-trustees. The condition placed on disbursements was that John Lawson provide the Defendants with medical bills to establish the *verified* dire and extreme circumstances requirement of the IT as reformed by the Arizona court.   Thus, the Defendants' actions were not unlawful under California Probate Code section 16.005.6.

**"Undue Influence" under the California Civil Code and Case Law**

19. The California Civil Code defines "undue influence" as: (1) "the use, by one in whom a confidence is reposed by another, or who holds a real or apparent authority over him, of such confidence or authority for the purpose of obtaining an unfair advantage over him;" (2) "taking an unfair advantage of another's weakness of mind;" or (3) "taking a grossly oppressive and unfair advantage of another's necessities or distress." Cal. Civ. Code § 1575.

20. Undue influence "is a shorthand legal phrase used to describe persuasion which tends to be coercive in nature, persuasion which overcomes the will without convincing the judgment. *Odorizzi v. Bloomfield School Dist.*, 246 Cal.App.2d 123, 130, 54 Cal.Rptr. 533 (1966) (citation omitted). "The hallmark of such persuasion is high pressure, a pressure which works on mental,

moral, or emotional weakness to such an extent that it approaches the boundaries of coercion." *Id*. "In essence undue influence involves the use of excessive pressure to persuade one vulnerable to such pressure, pressure applied by a dominant subject to a servient object." *Id*. at 131. "In combination, the elements of undue susceptibility in the servient person and excessive pressure by the dominating person make the latter's influence undue, for it results in the apparent will of the servient person being in fact the will of the dominant person." *Id*.

> Overpersuasion is generally accompanied by certain characteristics which tend to create a pattern. The pattern usually involves several of the following elements:
> (1) discussion of the transaction at an unusual or inappropriate time,
> (2) consummation of the transaction in an unusual place, (3) insistent demand that the business be finished at once, (4) extreme emphasis on untoward consequences of delay, (5) the use of multiple persuaders by the dominant side against a single servient party, (6) absence of third-party advisers to the servient party,
> (7) statements that there is no time to consult financial advisers or attorneys.

*Id.* at 133. In determining whether undue influence was exerted, the court is to look at the totality of circumstances. *Keithley v. Civil Service Bd.*, 11 Cal.App.3d 443, 451, 89 Cal.Rptr.809 (1970) (citations omitted). Thus, the court should consider "whether from the entire context it appears that one's will was overborne and he was induced to do or forbear to do an act which he would not do, or would do, if left to act freely." *Id*. (citations omitted).

21. Plaintiff cannot rescind the settlement agreement based on the argument that Defendants exerted undue influence over him as the term is defined in Civil Code section 1575 and the case law interpreting that statute.

22. The evidence does not support that the Defendants took unfair advantage of John Lawson, of his "weakness of mind", or of his "necessities or distress."

23. Ms. Linde represented John Lawson prior to the filing of the Los Angeles petition and provided him with able advice through the execution of the settlement agreement.

24. Ms. Linde confirmed that John Lawson was competent to make the decisions he did, and she allowed him to execute the settlement agreement.

25. While John Lawson represented to his brother that he had a brain tumor, consistent with the reformed provision of the IT, he was asked to submit medical bills if he wished to receive a disbursement for treatment expenses related to this condition. John Lawson did not do

1    so. This request was reiterated to Ms. Linde by Mr. Bemis, but still no medical bills were

2    submitted.

3        26. Moreover, John Lawson was receiving $3,800 to $8,000 a month from the Maritime

4    Trust, and had pre-paid for his dental needs with a credit on the books with his dentist. No

5    evidence was presented as to what medical expenses he had incurred or anticipated to incur in

6    connection with his brain tumor or any other medical condition which would exceed his income

7    from the Maritime Trust. Instead, the evidence established that when he entered into settlement

8    negotiations, John Lawson was able to pay his rent and utilities as well as his lawyer.

9        27. While he never received a formal college degree, John Lawson was well educated,

10   and was represented by counsel in most of his dealings with Defendants regarding the IT (from

11   the time the Arizona petition was filed when he was represented by Ms. Burns, during the

12   following years by Mr. Seaman, and then by Ms. Linde).

13       28. While John Lawson advocated that the Defendants began their course of conduct to

14   take advantage of him when they sought to reform the IT in Arizona, his own lawyer

15   (Ms. Burns) made the suggestion of imposing a cap on distributions John Lawson could receive

16   from the IT which was consistent with the order reforming the IT issued by the Arizona court.

17       29. Considering the hallmark elements of undue influence, as described in *Odorizzi,* the

18   evidence does not establish that Defendants used their position to take unfair advantage of John

19   Lawson.

20       30. First, the transaction was not discussed at an unusual or inappropriate time.

21   Settlement negotiations were initiated by Ms. Linde, and discussions between her and Mr. Bemis

22   took place, via e-mail, over the course of several days.

23       31. Second, the transaction was not consummated in an unusual place. John Lawson

24   signed the agreement at Ms. Linde's office. In fact, John Lawson had no direct contact with

25   William M. Lawson, Jr., at all while the settlement negotiations were ongoing.

26       32. Third, extreme emphasis on untoward consequences of delay or insistence that the

27   negotiations be finished at once were absent from the negotiations. Instead, the parties discussed

28   that it would be necessary to obtain a continuance of the hearing on the motion to quash and that

the Los Angeles petition should in essence be held in abeyance while a settlement was worked out. John Lawson was given time to consult with his attorney, who in turn sought tax advice on his behalf concerning the settlement arrangement. If anyone stressed time constraints, it was Ms. Linde who stated that the matter needed to be settled without further delay.

33. Fourth, there was no use of "multiple persuaders" by the Defendants against a "single servient party." John Lawson was represented by Ms. Linde and the Defendants were represented by Mr. Bemis. All settlement negotiations were conducted through Ms. Linde and Mr. Bemis.

34. Fifth, John Lawson had third-party advisers. In addition to being represented by Ms. Linde, Ms. Linde sought out tax advice prior to John Lawson entering into the agreement.

35. As to the final element, there is no evidence that there was any indication by the Defendants or Mr. Bemis that there was no time for consultation with attorneys or advisors. As indicated herein, Ms. Linde initiated the negotiations by submitting the first settlement proposal. She consulted with John Lawson throughout the negotiations, and she obtained tax advice before John Lawson entered into the agreement.

36. It is important to note that John Lawson did not sign the settlement agreement under protest. There is no indication in Ms. Linde's correspondence with Mr. Bemis that this agreement was unfair to John Lawson, or that he was signing it because he had no alternative. Instead, Ms. Linde initiated the negotiations with her settlement proposal which contained a release provision. Ms. Linde's correspondence which included the signatures of John Lawson and Tiffany conveyed her belief that the settlement agreement would "finally conclude" the matter.  Ms. Linde did not contact the court, ex parte or otherwise, to indicate that John Lawson had been coerced into signing the agreement. No evidence was presented at trial that in the year between the time John Lawson signed the settlement agreement and filed this action seeking rescission either John Lawson or Ms. Linde ever communicated anything to Mr. Bemis or William M. Lawson, Jr. to connote the belief that John Lawson had been coerced into entering into the settlement agreement.

///

1

**Economic Duress**

2      37. "The doctrine of economic duress can form a basis for rescission of a settlement

3   agreement." *Lanigan v. City of Los Angeles*, 199 Cal.App.4th 1020, 1034, 132 Cal.Rptr.3d 156,

4   168 (2011) (citing *Rich & Whillock, Inc. v. Ashton Development, Inc.*, 157 Cal.App.3d 1154,

5   1158-59, 204 Cal.Rptr. 86 (1984)). "However, the courts, in desiring to protect the freedom of

6   contracts and to accord finality to a privately negotiated dispute resolution, are reluctant to set

7   aside settlements and will apply 'economic duress' only in limited circumstances and as a 'last

8   resort.'" *Id.* (internal quotation marks and citations omitted).

9      38. The doctrine of economic duress is "equitably based ... and represents 'but an

10  expansion by courts of equity of the old common-law doctrine of duress.'" *Rich & Whillock*, 157

11  Cal.App.3d at 1158, 204 Cal. Rptr. at 89 (citations omitted).

12     39. The doctrine "come[s] into play upon the doing of a wrongful act which is

13  sufficiently coercive to cause a reasonably prudent person faced with no reasonable alternative to

14  succumb to the perpetrator's pressure." *Id.* (citations omitted); *accord Myerchin v. Family*

15  *Benefits, Inc.*, 162 Cal.App.4th 1526, 1539, 76 Cal.Rptr.3d 816 (2008).

16     40. A threat to withhold payment "may constitute a wrongful act for purposes of the

17  economic duress doctrine." *Rich & Whillock*, 157 Cal.App.3d at 1159, 204 Cal. Rptr. at 80

18  (citations omitted).

19     41. "Hard bargaining, 'efficient' breaches and reasonable settlements of good faith

20  disputes," on the other hand, "are all acceptable, even desirable, in our economic system."

21  *Rich & Whillock*, 157 Cal.App.3d at 1159, 204 Cal.Rptr. at 90.

22     42. A party seeking to rescind an agreement based on the economic duress doctrine "must

23  have had no 'reasonable alternative' to the action it now seeks to avoid (generally, agreeing to

24  contact)." *Lanigan,* 199 Cal.App.4th at 1034, 132 Cal.Rptr.3d at 168 (internal citation and

25  quotation marks omitted). "If a reasonable alternative was available, and there hence was no

26  compelling necessity to submit to the coercive demands, economic duress cannot be

27  established." *Id.* (internal quotation marks and citation omitted)).

28  ///

43. There is no economic duress because William M. Lawson, Jr., did not threaten to withhold mandatory distributions to John Lawson. Under the original IT, distributions to John Lawson were always discretionary with the trustees. Under the reformed IT, which had not been set aside as of the time John Lawson negotiated and entered into the settlement agreement, distributions to John Lawson remained discretionary, but were also subject to the further restriction of verified dire and extreme circumstances as well as the lifetime cap. Mr. Bemis clearly communicated to Ms. Linde that William M. Lawson, Jr., had never conditioned disbursements on John Lawson signing release; instead, he had asked John Lawson to submit medical bills, and this was never done.

44. Nor can the alleged threat to "spend the trust to zero" constitute a wrongful act supporting John Lawson's economic duress claim. Mr. Bemis told Ms. Linde and John Lawson that engaging in protracted litigation would reduce the value of the trust. This was an accurate statement of the risk John Lawson faced not only if he decided against settling the action, but this risk was present when he first decided to bring the Los Angeles petition. As discussed in the next paragraph, the trustees' expenses of litigation may legitimately be expended from the trust.

45. Under California law, "a trustee may use trust funds to pay for legal advice regarding trust administration (Cal. Prob. Code § 16247) and may recover attorney fees and costs incurred in successfully defending against claims by beneficiaries." *Wells Fargo Bank. v. Sup.Ct.*, 22 Cal.4th 201, 213, 91 Cal.Rptr.2d 716 (2000) (citations omitted). "When the law gives the trustees a right to use trust funds, or to reimbursement, the funds do not in law belong to the beneficiaries." *Id*. "Conversely, if the trustee's expenditures turn out to have been unauthorized, the beneficiaries may ask the probate court to surcharge the trustee." *Id*. In *Wells Fargo*, the court commented that while it *may* be a better practice for a trustee to seek reimbursement after litigation with the beneficiary concludes, but this is not *required* by the law. *Id*. at 213 n. 4 (citation omitted); *see also Kasperbauer v. Fairfield*, 171 Cal.App.4th 229, 236, 88 Cal.Rptr. 494 (2009) ("Nothing in the Probate Code or case law requires that attorneys who aid a trustee in trust administration must await a final adjudication of the beneficiaries claims against the trustee to receive compensation.")

46. Therefore, Mr. Bemis's statement regarding the potential for litigation to reduce the value of the trust does not constitute a wrongful act under the economic duress doctrine. This statement was made not only to John Lawson, but to his attorney, Ms. Linde. She should have known that this was a risk inherent in litigating the petition. Moreover, if she disagreed with the trustees utilizing trust funds to pay the Defendants' legal fees, she could have filed a motion requesting that the assets of the IT be frozen while the litigation was pending. Alternatively, she could challenge any attorney's fees and costs charged to the IT if the trustees were unsuccessful. She could also challenge the fees charged to the IT even if the trustees were successful but she deemed the fees to be unreasonable.

47. The second requirement of an economic duress claim is that the plaintiff must show he had no other reasonable alternative, and as such, was forced to succumb to the defendant's financial pressure.

48. John Lawson did in fact have other options available to him. He could have proceeded with litigation. While he contends that this would have resulted in William M. Lawson, Jr., and Mr. Bemis "spending the trust to zero," as indicated *infra,* his able counsel could have made a motion requesting that the court freeze the assets of the IT while the litigation was pending, reserving any request for fees by the trustees until such time, if ever, that they were successful in defending against the petition.

49. Ms. Linde also raised the argument that continuing to litigate was not really an option because it would have cost money, but John Lawson should have been prepared to spend money to litigate the petition when he filed it in the first place.

50. As another alternative to entering into the settlement agreement, Ms. Linde could have submitted her concerns about economic duress or undue influence to the court. She could have raised them directly with Mr. Bemis, but she did not do so. Instead she told Mr. Bemis: "Thank you for ensuring that this matter is timely and fully concluded."

51. If John Lawson did not want to proceed with the settlement and did not want to proceed with litigation, another option available to him was to dismiss the petition and submit his medical bills to the trustees with a request for disbursement.

1    52. "[A] reasonably prudent person subject to [a wrongful act under the economic duress

2    doctrine] may have no reasonable alternative but to succumb when the only other alternative is

3    bankruptcy or financial ruin." *Id*. (citations omitted).

4    53. The evidence presented at trial did not demonstrate that John Lawson faced the

5    prospect of bankruptcy or financial ruin if he did not acquiesce and settle. He was receiving

6    between $3,800 and $8,000 a month from the Maritime trust. No evidence was presented

7    regarding what medical expenses he anticipated incurring that would exhaust these funds. In fact,

8    he was able to pay his attorney, pay his rent and utilities, and had a credit with his dentist for

9    dental work being performed. John Lawson did not meet his burden of proving he was subject to

10   economic duress.

11                   **California Probate Code and Welfare and Institutions Code**

12   54. In this action, John Lawson seeks rescission of a settlement agreement that he entered

13   into as a beneficiary of the IT with the Defendants, who were co-trustees of the IT. This was a

14   settlement agreement involving parties to a fiduciary relationship. For this reason, the court's

15   inquiry does not end with its analysis under California Civil Code § 1688, *et. seq*. and the

16   common law of undue influence or economic duress.  The court must also examine the interplay

17   of the provisions of the California Probate Code that apply to transactions between a trustee and

18   beneficiary.

19   55. This is because the California Probate Code applies to "*all proceedings concerning*

20   *trusts* commenced on or after July 1, 1987," Cal. Prob. Code § 15001(b) (emphasis added), and a

21   beneficiary of a trust may commence a proceeding to set aside an act of a trustee. Cal. Prob.

22   Code § 16420(a)(6).

23   56. The Probate Code also provides that absent improper conduct by a trustee, "a

24   beneficiary may be precluded from holding the trustee liable for a breach of trust by the

25   beneficiary's release or contract effective to discharge the trustee's liability to the beneficiary for

26   that breach." Cal. Prob. Code § 16464(a), (b). In other words, the Probate Code recognizes that a

27   beneficiary of a trust may release a trustee from an alleged breach of the trustee's fiduciary

28   duties, as long as the trustee did not engage in improper conduct in arranging for the release.

Here, the court must analyze whether the trustees engaged in such improper conduct, *i.e.*, whether they utilized undue influence as defined under the Civil Code or Probate Code or economic duress so as to coerce John Lawson to enter into the settlement agreement.

57. The California Probate Code contains its own definition of undue influence which it defines as being the same as the definition of undue influence provided in Welfare and Institutions Code section 15610.70. *See* Cal. Prob. Code § 86. In deciding to apply the Probate Code's definition of undue influence, the court is persuaded by the language of the Probate Code itself, which specifically states that the definition is intended to "*supplement* the common law meaning of undue influence without superseding or interfering with the operation of that law." *Id*. (emphasis added).

58. In closing argument, Defendants argued that the Welfare and Institutions Code definition of undue influence cannot apply to this action because the parties entered into the settlement agreement in June 2013, and the statute has an effective date of January 1, 2014. However, the California Probate Code, which invokes that definition of undue influence, provides that "a new law applies on the operative date to all matters governed by the new law, regardless of whether an event occurred or circumstances existed before, on or after the operative date, including, but not limited to, creation of a fiduciary relationship ... commencement of a proceeding, making of an order, or taking of an action." Cal. Prob. Code § 3(c). Therefore, the court may apply that definition to this action.

59. Section 15610.70 of the Welfare and Institutions Code defines "undue influence" as "excessive persuasions that causes another person to act or refrain from acting by overcoming that person's free will and results in inequity." Cal. Welf. & Inst. Code § 15610.70(a). In determining whether a result was procured by undue influence, the court is to consider various factors set forth in the statute, which the court will discuss in turn below.

60. The first factor is "the vulnerability of the victim," which under the statute, "may include, but is not limited to, incapacity, illness, disability, injury, age, education, impaired cognitive function, emotional distress, isolation, or dependency, and whether the influencer knew

or should have known of the alleged victim's vulnerability." Cal. Welf. & Inst. Code § 15610.70(a)(1).

61. John Lawson testified that he was disabled, and had not worked for some time, but did not elaborate as to how he was disabled. He also testified generally that he had experienced pain from various medical and dental conditions, but did not indicate what specific effects his medical condition had on him so as to evidence his vulnerability. The evidence did reflect that John Lawson conveyed to William M. Lawson, Jr., that he had a brain tumor; however, no medical evidence was offered to substantiate this diagnosis. Ms. Linde testified that she never sought to have a guardian ad litem appointed for John Lawson, which would have been necessary if he did not understand the decisions he was making. Moreover, at the time he signed the settlement agreement she determined he was fit to do so and allowed him to proceed with its execution. In addition, John Lawson was fairly well educated.

62. The second factor is "the influencer's apparent authority," and evidence of this "may include, but is not limited to, status as a fiduciary, family member, care provider, health care professional, legal professional, spiritual adviser, expert, or other qualification." Cal. Welf. & Inst. Code § 15610.70(a)(2). There is no dispute that there was a fiduciary relationship between John Lawson, a beneficiary of the IT, and the Defendants, who were co-trustees of the IT. While William B. Lawson, Jr., is an attorney, he had no particular expertise in the law of trusts or estate planning. Sharon Ondreyco has been designated a medical doctor in the pleadings, and it was not disputed that she has this designation, but no evidence was presented at trial concerning her status as a medical doctor, or her knowledge of John Lawson's medical conditions.

63. The third factor is "the actions or tactics used by the influencer," evidence of which may include, various additional elements, which will be discussed in turn.

64. The first element of the third factor is: "Controlling necessaries of life, medication, the victim's interactions with others, access to information, or sleep." Cal. Welf. & Inst. Code § 15610.70(a)(3)(A).

65. There is no evidence that the Defendants controlled John Lawson's interactions with others or his sleep.

66. Nor did the evidence suggest that Defendants controlled John Lawson's necessaries of life or medication. All distributions to John Lawson from the IT were discretionary. As reformed by the Arizona court, the IT required verified dire and extreme circumstances for a distribution to be made to John Lawson. When the Arizona petition was initially filed, Defendants requested an expedited hearing due to John Lawson's impending dental care, but that request was subsequently withdrawn with a representation made to the Arizona court that John Lawson had advised the Defendants he no longer required the IT funds for his dental care. In the following years, William M. Lawson, Jr., requested that John Lawson provide medical bills if he was seeking a distribution from the IT.   There was one occasion where he did so, and a disbursement was made. No other medical bills were provided.

67. Additionally, John Lawson was receiving $3,800 to $8,000 from the Maritime Trust. There was no evidence offered to establish that his medical bills exceeded his monthly income from the Maritime Trust, or that John Lawson anticipated medical bills that would exceed that income. He was able to pay his rent and utilities, as well as his lawyer.

68. The second element of the third factor is: "Use of affection, intimidation, or coercion." Cal. Welf. & Inst. Code § 15610.70(a)(3)(B).

69. John Lawson essentially argued that William M. Lawson, Jr., used intimidating and coercive tactics to get him to enter into the settlement agreement because he conditioned disbursements on obtaining a release, and threatened to "spend the trust to zero" if John Lawson did not acquiesce. These arguments have already been addressed with findings adverse to John Lawson. The court incorporates that rationale here.

70. The third element of the third factor is: "Initiation of changes in personal or property rights, use of haste or secrecy in effecting those changes, effecting changes at inappropriate times and places, and claims of expertise in effecting changes." Cal. Welf. & Inst. Code § 15610.70(a)(3)(C).

71. Preliminarily, as the court has repeatedly emphasized, John Lawson had no absolute right to disbursements under the IT, either as it existed originally or as reformed by the Arizona court. Distributions to him were always discretionary with the trustees, with the added

restrictions of verified dire and extreme circumstances and the lifetime cap from the Arizona court.

72. In any event, there was no secrecy in effecting changes to the IT. The Defendants advised John Lawson they would be filing the action in the Arizona court to seek guidance on their duties as trustees in light of the fact that the Trustor had passed away before Tiffany reached the age of thirty-five. The action was filed in a public forum, and John Lawson retained counsel to represent his interests in that action, at least until Ms. Burns was permitted to withdraw as counsel. His own attorney suggested that a cap be placed on any distributions made to John Lawson, a term which was later adopted by the Arizona court. John Lawson participated telephonically in the evidentiary hearing in that action and presented his arguments. He did not seek to set aside the Arizona court's order until he filed his petition in Los Angeles some seven years later. He was subsequently represented by Mr. Seaman, who communicated with William M. Lawson, Jr., as well as his counsel. He retained Ms. Linde in 2012, who represented his interests through execution of the settlement agreement.

73. The fourth factor is "the equity of the result," evidence of which "may include, but is not limited to, the economic consequences to the victim, any divergence from the victim's prior intent or course of conduct or dealing, the relationship of the value conveyed to the value of any services or consideration received, or the appropriateness of the change in light of the length and nature of the relationship." Cal.Welf. & Inst. Code § 15610.70(a)(4). "Evidence of an inequitable result, without more, is not sufficient to prove undue influence." Cal. Welf. & Inst. Code § 15610.70(b).

74. In the Los Angeles petition, John Lawson sought: (1) to transfer jurisdiction over the IT from Arizona to California (Los Angeles); (2) to have the Defendants removed as co-trustees and have a successor trustee appointed; (3) to segregate merged funds and restore to separate trusts including the appointment of a forensic accountant; (4) to vacate the Arizona court order; (5) to direct the trustees to distribute segregated funds for John Lawson's health needs; (6) to award damages for Defendants' failure to notify John Lawson of the trust and for breach of

1    fiduciary duties; and (7) an award of attorney's fees and costs incurred in connection with the

2    petition.

3        75. As a result of the settlement agreement resolving the Los Angeles petition, John

4    Lawson and Tiffany were to be appointed as successor co-trustees, implying the resignation of

5    Defendants as co-trustees. The Defendants agreed to account to John Lawson and Tiffany for the

6    IT, showing all receipts and/or additions to the Descendant's Trust received by the IT from and

7    after June 30, 2012 and the sources, including tax documents and all expenses incurred or

8    deducted through the date of the account. Defendants would provide John Lawson and Tiffany

9    an accounting for the Descendant's Trust Note from April 3, 2011 through the date of the

10    account and provide a copy of the note. John Lawson and Tiffany were to receive tax returns for

11    the IT from 2006 to 2012, accountings from January 2, 2004 to May 24, 2013, and checking

12    account summary statements. John Lawson and Tiffany gained access to the IT funds and

13    succeed to the IT's entire interests in the Hobart Partnership and Admiral Lawson LLC. The net

14    amount he received was $106,000, and $40,000 went to Tiffany. By reason of the settlement,

15    John Lawson abandoned the right to pursue his claims of breach of fiduciary duty against the

16    Defendants.

17        76. The court cannot conclude that this is an inequitable result. John Lawson received

18    nearly all of the relief he requested in the petition, except for his ability to pursue the breach of

19    fiduciary duty claims. In agreeing to give up these claims, he was advised by competent legal

20    counsel. If he did not settle the action, he would have been in the same position he was in when

21    he filed the Los Angeles petition: litigating it in the Los Angeles County Superior Court. In

22    exchange for giving up his right to pursue these claims, he did not have to pay Ms. Linde to

23    continue to litigate the petition, and up until the point he decided to bring this action, he had

24    secured some finality with respect to the dispute surrounding the administration of the IT.

25    ///

26    ///

27    ///

28    ///

### III. CONCLUSION

Upon consideration of all the evidence and the parties' arguments, the court concludes that John Lawson is not entitled to rescind the settlement agreement he entered into with the Defendants in June 2013 that resolved the Los Angeles petition. As a result, his remaining claims also fail, and Defendants are entitled to the entry of judgment in their favor on all claims in this action.

**IT IS SO ORDERED**.

Dated: October 20, 2015.

WILLIAM G. COBB
UNITED STATES MAGISTRATE JUDGE